Pension Benefit Guarantee Corporation 237868 Mr. Blumenfeld. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Jeremy Blumenfeld, and I represent the Local 550 Fund Trustees. With the Court's permission, I'd like to reserve two minutes of my time for rebuttal. This is a case about the PBGC's decision to deny the fund's application for special financial assistance, SFA. The denial letter is contained in the joint appendix at pages 42 to 43. In resolving the case below, the District Court explained that the critical question was whether a terminated multi-employer fund can be restored and thus exit terminated status. We agree that this is a critical question, but the District Court got it wrong. To start, it's important that the termination of the fund... Well, I guess more specifically whether a self-terminated fund can restore itself, because we know the agency can, right? Correct. You're right, Your Honor, and getting to the meat of the matter, 29 U.S.C. 1347 gives the PBGC the power to restore certain terminated plans and to halt the termination of a plan that is in process. Well, since we're getting more refined about it, the statute doesn't actually speak to PBG&C's authority to restore a multi-employer plan that terminated by withdrawal of all employers. It only speaks to restoring single-employer plans. Is that right? Correct. 1347 doesn't actually address multi-employer plans at all, but the District Court and the PBG&C relied on that as the basis for denying the fund's application. In fact... So, I just want to make sure, and I do want you to get back to that, is are you then conceding that if the plan were still terminated, it would be ineligible for the funding? So, there are arguments to be made that a terminated plan also could be eligible. In our appellate brief, Your Honor, we focused on the argument that this plan had been restored. We're making the argument that this plan was restored and therefore is eligible for special financial assistance on that basis. Thank you. Now, back to Judge Roth. Sure. So, the PBG&C's denial letter, two-page letter, said that the PBG&C has the power to restore certain plans or to halt the termination of certain plans without citing, by name, 1347, but relying on that statute specifically. But now we know from the appellate briefing, Your Honors, that even the PBG&C acknowledges that 1347 is not exclusive because 1347 has two provisions. One that says the PBG&C has the authority to halt the termination of a plan that is in process, and the other that says the PBG&C has the authority to restore certain plans. The PBG&C says the second one doesn't apply to our circumstances, and therefore the PBG&C can't restore our plan, and the PBG&C and only the PBG&C can restore certain plans. That's the way they interpret 1347. But then in the first part of 1347, which says that a plan that is in the process of being terminated can have that process halted by the PBG&C, in that circumstance, we all agree, the PBG&C and the fund agree, that not only can the PBG&C do that, but a plan sponsor or administrator can do that. But I was puzzled by that argument because it doesn't strike me that, and we're now talking about a single employer plan, a single employer plan that is in the process of terminating doesn't need statutory authority to decide to stop that process. That's not a, it's not a process whereby once you take the first step, you are inexorably bound to go all the way the distance. So the fact that the statute doesn't expressly describe that fact doesn't strike me as evidence that this statute is somehow not comprehensive. So it's a matter of statutory construction, Your Honor, because 1347 refers to the PBG&C's authority to do both of those things. If the PBG&C's authority to do the first one is not exclusive, then the PBG&C's authority to do the second one also shouldn't be exclusive. You're asking the right question. What is it that gives the fund the power to restore itself then? Well, and how does that fit with the fact that you only have one contributor employer, right? So like why are you even a multi-employer plan? So there is only one employer contributing to the plan at this point in time, and maybe the plan wouldn't be a multi-employer plan, but that doesn't mean it's not eligible for the special financial assistance. In other words, there are participants in the plan that had lots of contributing employers in the past. There are participants in the plan when this was a multi-employer plan, and the fact that all of the employers except for one are no longer contributing doesn't make it not a multi-employer plan for purposes of the special financial assistance program. The way a multi-employer plan gets created in the first place, Your Honors, is a plan amendment or a collective bargaining agreement adopting it. The way a multi-employer plan is terminated, to your point, Your Honor, is a collective bargaining agreement or pension plan amendments terminating the plan. There's no reason that a plan can't be restored. A multi-employer plan can't be restored for the same reasons. And by the way, when a multi-employer plan is terminated, it continues to operate the same way it operated before. Also, I mean, I think part of the challenge we're having is that what the word terminated means, and, you know, per ERISA purposes. And there are some things that I have seen suggesting it refers to, like, a past event, and others that it refers to a status. Is that an appropriate way to characterize the dispute that we're having? I think it's a reasonable way to think of the issue. I haven't thought about it in that way. Okay, so can you help me figure out which one you think you need and you qualify for? Is it a status or a past event? I think, so I would say either one, Your Honor, because if it's a status, the plan is no longer a terminated plan as of now. And if it's a past event, what matters under the statute, the special financial assistance statute that we are talking about, does not say that a terminated plan is not eligible for special financial assistance. In fact, as we point out in the brief, there are four eligibility criteria, A, B, C, and D. D says that a plan that has terminated as of, I think it's March 11 of 2021, isn't eligible under that provision. A and B and C, most importantly, A, the one applicable here, doesn't have that exclusion. That proves too much, though, doesn't it? That essentially says any terminated plan, without regard to whether it's restored, is eligible for the ARPA money. What it says, Your Honor, I would say is that Congress wasn't thinking about the fact that a plan had or hadn't been terminated would bear on its eligibility under A or B or C. Here, the plan is restored and the PBGC has said that you can't do that, but that's the point of pointing out that legislation. So when a multi-employer plan is terminated through withdrawal of all the members, there are a whole bunch of consequences to how the plan operates, as I understand it. So you get the 1441 benefit cuts. You get federal insurance backfilled. And so I'm trying to understand what it looks like if you can then take a plan that's been operating, let's call it in a terminated status, and you restore it to an active status. How do you unwind the consequences of the determination? Do you restore the 1441 benefit cuts? Do you return the federal insurance money that's been paid? Do you cut off ongoing federal insurance benefits? Are the other withdrawing employers treated as if they withdrew from an ongoing plan rather than a mass withdrawal, which has very different consequences for their liability? What are the consequences? Yeah, so a number of those issues, Your Honor, don't actually, aren't triggered by the termination of a multi-employer plan, like the PBGC stepping in to pay benefits. That is not a consequence of the termination of a multi-employer plan. And the benefit cuts aren't necessarily a consequence of the termination of a multi-employer plan. And by the way, plans that are in critical and declining status that have not terminated also can provide similar kinds of benefit cuts. To your question about what happens to the employers who withdrew, their withdrawal liability is assessed as of the withdrawal. And so they continue to pay those benefits, and the fund continues to benefit and receive those monies to the extent appropriate. The fact that the plan may subsequently not be terminated anymore is irrelevant to the status of the withdrawal liability that those employers owed for their employees during that period of time. Except that in calculating the withdrawal liability, as I understand it, it's a much bigger hit if you're withdrawing as part of a mass withdrawal than if you're withdrawing as part of a, you know, I'm withdrawing, but the plan is marching along per usual. And so now you're saying that those other employers are stuck with the hit of a mass withdrawal, but yet the plan gets to go forward as a continuing plan. And the reason that the mass withdrawal liability, it's not always higher, Your Honor. It can continue for a longer period of time in the context of a mass withdrawal. But the reason for that is that those employees who they were responsible for paying for the benefits for are in the plan, and there isn't enough money in the plan to cover those liabilities. The Special Financial Assistance Program brings the plan up from where it is to where it would be able to fund all of those benefits. In the same way that a plan that is in critical and declining status but active has employers who are contributing, who are making payments into the fund, but the Special Financial Assistance brings that fund up to the plan, up to the point where it can pay all of the benefits that it's supposed to pay. Right, if they're eligible. I mean, all of that is how it would operate if we rule in your favor on the threshold question, right?  And so what I'm struggling with is this is a really heavily regulated, in a detailed way, scheme. And now you're describing this process, and I ask you these questions about what happens with this and what happens with that, and you've had answers, but those are answers that aren't actually in the statute. And if there were, if the statute contemplated restoration of a multi-employer plan terminated by mass withdrawal, wouldn't it have said that somewhere? In the same way, Your Honor, that the statute contemplates that a plan, a multi-employer plan, can come into existence in the first instance. But there isn't a specific statutory provision that says this is how you do it. This is really no different than that circumstance. And because the plan, once it terminates by mass withdrawal, continues to operate in the same way it did before, there's not a reason to have a specific statutory provision. And I would analogize, Your Honor, to the same circumstance when you have a single employer plan that's in the process of terminating. The plan can have that process halted by the plan sponsor. And 1347, the statute that the district court relied on, their interpretation of that statute would mean 1347 says that the PBGC and only the PBGC can do that. We all agree that that's not the case. And so the fact that a plan sponsor or administrator of a multi-employer plan can take the steps necessary to restore that plan is really no different. Thank you. Thank you, Your Honor, unless the court has any questions. We'll hear from you again. We'll hear from Mr. Ginsburg. Good morning, Your Honors. John Ginsburg for the Pension Benefit Guarantee Corporation. Section 1347 is one and only provision on restoration of terminated pension plans of any kind by anyone. It expresses that PBGC may restore a plan terminated under Section 1341 or 1342 and omits the ability to restore a plan terminated by Section 1341A, which governs termination by mass withdrawal. The expression of the one or here the two excludes the others. I heard no argument from Fund Council as to why the single best meaning of ERISA is that a plan terminated by mass withdrawal can be restored. Fund Council argued that PBGC added an eligibility criterion to the eligibility test under which the fund applied, which required that it be in critical and declining status. PBGC did no such thing. It is true that only one of the four eligibility tests contains within its express language an exclusion of terminated plans. But an exclusion of plans terminated by mass withdrawal inheres in the test for eligibility based on critical and declining status because Congress already provided in a separate section of ERISA, which must be interpreted holistically, that a plan terminated by mass withdrawal has no funding status, no zone status, is not in critical and declining status in a subsequent plan year. Let me just sort of zoom back from the weeds of this subsection of this provision for a second. The purpose of ERISA in this context is to protect the hard-earned retirement monies of workers who rely on these pension plans. I totally understand that in the course of history there's never been a context in which it's advantageous for a multi-employer plan terminated by mass withdrawal to seek restoration. That's not going to make the workers better off. But you can imagine this is obviously an exception to that. You can imagine other scenarios. You can imagine a mass withdrawal precipitated by market conditions that turn around, and they turn around in a way that actually creates the opportunity to keep those workers whole, make those workers whole, rather than having to take a haircut on their benefits. This is clearly an opportunity to make those workers whole. Why isn't it consistent with both the clear intent of ERISA and ARPA to understand the statute that's arguably ambiguous in a way that allows the restoration and the appropriation of the funds? Judge Robinson, you're right about the general purposes of ERISA and of the Special Financial Assistance Program. However, as the Supreme Court recognized in Merton v. Hewitt, the general purposes of a statute don't supersede the specific provisions of the statute. I understand that. I'm hoping you're going to give me a policy reason why this is not only compelled by the statutory language, but it makes sense given the statutory structure. Maybe I can ask the question in a different way. What would be the impact of us disagreeing with your interpretation and us concluding that a terminated multi-employer plan can be restored? What will that do to the rest of the ERISA scheme that we haven't thought about, that we don't know? Beyond this case, it's unlikely, unless there's another plan that might seek to restore itself, to render itself eligible, it's unlikely to have impact beyond this case. In ERISA's entire 50-year history, no multi-employer plan terminated by mass withdrawal has ever sought to restore itself. So you think the worst thing that would happen if we disagree with your interpretation is that other multi-employer plans would then try to restore itself? I'm not suggesting any judgment about good or bad. It's really not PBGC's role to look behind the clear, unambiguous implications of the statute to discern some overriding policy concern. The Supreme Court in Loperbright said that every statute has a single best meaning, which the court is to determine by applying all tools of statutory construction. Okay, so can we go back then to A of 1085? So, I'm sorry, 1432B1A. It says the plan is in critical and declining status within the meaning of Section 1085B6. One of the things that I think you're asking us to read is that it's not just within the meaning of 1085B6, but that it incorporates all of the limitations in the entirety of 1085. Am I wrong? And how would that rate to the best reading of the statute? I'm not sure I understand the question. Well, because 1085B6 is just a definition. And it's actually a definition that says for the purposes of this section. And by you suggesting that there's this part of termination and then this other part of termination and these are the exclusives, you are asking, I think, us to read more into what A encapsulates than merely a definition of what is critical and declining that may or may not include a plan that was restored or terminated. Under Section 1081C, the funding provisions of ERISA do not apply to a plan terminated by mass withdrawal. That is because, by definition, all of the employers are gone. There's no employer subject to the funding standards. It's there to fund the plan. There's no reason to have the plan be in critical and declining status, which provides for tools for the trustees of the plan to impose a higher contribution rate on employers. The definition, the concept, all of the provisions, the provision requiring certification of the plan's zone status to the Internal Revenue Service, all of it does not apply after the plan year of the plan's termination by mass withdrawal. I think you're answering a slightly different question. It makes sense that for purposes of this section dealing with what you do with critical and declining plans, the provisions cease to apply once they're terminated. But I think the question is the ARPA statute in saying who's eligible for the money says if it's in critical and declining status within the meaning of 1085B6, it asks us to use a definition. 1085B6 just gives a definition. It doesn't, say, it doesn't necessarily incorporate all of the other provisions in that statutory section, including time limits. So you're incorporating the time limit of critical and declining status into the definition of critical and declining status. Does that make sense, or am I confusing it more? I understand your reasoning, but if the definition doesn't apply at all, you're incorporating the definition into the eligibility standard. And PBGC is reading the concept of critical and declining status as it's written in Titles I and II of ERISA, that it does not apply as provided by Congress. But I just want to say PBGC has no agenda here. We're not trying to deny the plan special financial assistance. We're simply, we are a creature of statute and bound by statute. And as we read Title I, 1081C, under it, the zone status provisions, critical and declining status, does not apply. The definition does not apply. If we concluded otherwise, and I think this goes to Judge Perez's question, there were certain subsidiary conclusions that we would reach. And one of them is that a multi-employer plan terminated by mass withdrawal can restore itself. Would that conclusion mess up other things that we don't realize? That's similar to Judge Perez's question, and I cannot think of any. Okay. I just wanted to make sure. There is a finite pot of money, right, at the end of the day. For special financial assistance, Your Honor? Yeah. Actually, the appropriation is more or less a blank check. So there's not a finite pot of money? There's not. Okay. And that's really a separate statute. I mean, even outside of the ARPA framework, if we said a multi-employer plan could restore itself, change market conditions, something like that, it doesn't cause you to say, oh, but then we would have no mechanism for managing X. You agree with your colleague that, no, it wouldn't change the withdrawal liability for the other employers who withdrew as part of the mass withdrawal, and the plan would march on and perhaps accumulate more employers? I can think of no societal impacts, no impacts on plans within the system. It would create a number of statutory problems that are identified and thoroughly discussed in PBGC's brief, such as about how the funding provisions of Titles I and II of ERISA would apply upon the restoration of the plan. There are very intricate provisions for accounting for funding for these plans with interdependency between accounting years. Right. I think that's what we're really looking for. So you're referring us to your brief for that? Yes, to overlapping amortization schedules. The withdrawal liability issue would create complexities about relief from mass withdrawal for the other employers, as you spoke about earlier. If I may, what is your position on whether or not it is actually a multi-employer plan to have only one contributor? This is an issue of first impression. PBGC does have an opinion letter concluding that it is the law that once a multi-employer plan has only one remaining employer, it remains a multi-employer plan. It remains? Is that what you said? Yes. Okay. Once a multi-employer plan, always a multi-employer plan. This issue of what this plan would be upon an employer rejoining the plan is really an issue of first impression. But if you have five employers and they withdraw one by one and you're left with one, it's still a multi-employer plan as far as you're concerned.  Okay, thank you. Thank you. Mr. Blumenthal. Thank you, Your Honors. I just want to briefly talk about statutory language and policy. In terms of statutory language, the PBGC relied on 1347 as the basis for its conclusion that a multi-employer plan can't be restored by a plan sponsor or administrator. I explained in my opening remarks why that doesn't work because the same statutory provision is there with respect to halting the termination of a plan that is in process. PBGC really didn't respond to that, so I think there is absolutely statutory basis for allowing a multi-employer plan to restore itself, and nothing in 1347 prohibits that. In terms of policy, the next special financial assistance if Congress chooses to enact such a thing, they can add provisions to that saying that terminated plans can or cannot be eligible for it, just like they did in D here if that's what they wanted. The current program, though, for example, under A that we applied for, was a narrow time period, a two-year window, so I don't think there is another plan that could come in now and restore itself and become eligible under provision A of the statute. But the PBG, I think the other argument, and we didn't get too into the weeds in the specifics because the reference was to the briefs, is that there would be a whole bunch of unanswered statutory questions about how to manage the restoration process in light of the unwinding that's happened, incident to termination. What's your response to that? Yeah, I don't think it's complicated, or maybe I'll say it this way. I don't think it's that much more complicated than anything you have to do with respect to pension plans or multi-employer plans to begin with. These zone status rules are not simple. Withdrawal liability is not simple. This doesn't add an immeasurable layer of complexity, and certainly a lot of those questions are not answered in the statute but are addressed by the courts that have to address these issues. Just in terms of the policy question, Your Honors, these plan participants are in this situation through no fault of their own. These retirees are hurting financially for the very reasons that the Special Financial Assistance Program and the American Rescue Plan was designed to address, including even down to the fact that these participants and beneficiaries, these retirees, were impacted by the Hostess Bakery bankruptcy, which is one of the precursors, one of the factual findings that led to this Special Financial Assistance Program in the first place. For each and all of these reasons, Your Honors, unless the court has any questions… Can I ask one more question? Please. The actuary. So, you are in this position where you claim that you're eligible and there's a perfunctory rule regarding an actuarial certification. They would argue, or your colleague on the other side would argue, that that effectively means that the actuary gets to decide whether or not you're eligible under your theory. Do you have a response to that? So, I think the actuaries get to decide our circumstance like everybody else. And if you look at the statutory provisions that they point to in their brief, it's the next subsection in the ARPA statute. It says that the PBGC can review certain actuarial assumptions for plans terminating before a certain date. So, they could decide. They would still have the authority to be able to say your actuary was wrong, we don't agree. They would still retain that ability. It's not a function. To challenge the actuarial assumptions? Yes. Yes, there's a reasonableness standard for some and a different standard for others. Because of the urgency of this matter, while the matter was playing out on the legal question in the district court, we continued to dialogue with the PBGC on the question of the assumptions and the math. And we got to a place where this is the only issue. And so, if we are eligible for special financial assistance, the idea is we would submit an application that has not been seen formally by the PBGC, but all of the assumptions were already submitted to the PBGC. That application was then withdrawn because there are time periods for the PBGC to grant or deny an application. But if you all say this fund is eligible for special financial assistance, we'll submit that application and it should be starting to get money to these retirees in relatively short order. Thank you. Thank you, Your Honor. Appreciate it. Appreciate it both. Well argued. And we will take it under advisement.